IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| REVEREND ALICIA BYRD, Ph.D., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.: 17-cv-03251-DKC |
| BISHOP WILLIAM P. DEVEAUX, SR., *et al.*, | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

The central issues in this case involve the internal church policies and procedures of the African Methodist Episcopal Church, Inc. ("AME Church") and the Washington Annual Conference of the African Methodist Episcopal Church ("Washington Conference") and the church's discipline of one of its now former pastors – matters which the First Amendment provides are left to the churches themselves and are not subject to judicial intervention. Plaintiff Alicia Byrd, Ph.D. ("Plaintiff") disagrees with the church's decision to remove her as a pastor and has brought false light invasion of privacy claims for statements allegedly made by Bishop William P. DeVeaux, Sr. ("Bishop DeVeaux"), the AME Church, and the Washington Conference (collectively, "Defendants") in connection with her removal as a pastor.

Plaintiff's claims fail for a number of reasons. First, her claims are barred by the First Amendment, the ecclesiastical abstention doctrine, and the ministerial exception because the subject of this lawsuit is the church's internal policies and procedures. Second, her claims fail as a matter of law because the undisputed facts demonstrate that she cannot satisfy each of the elements of her claims as to each of the Defendants. Third, her claims are subject to the common

interest privilege. Fourth, her claim for vicarious liability fails as a matter of law because there is no such standalone cause of action. And, finally, the undisputed facts demonstrate that she is not entitled to punitive damages.

Because Plaintiff cannot prevail as a matter of law on any of her claims, the Court should enter summary judgment in Defendants' favor as to each of Plaintiff's claims.

## I. FACTS MATERIAL TO MOTION FOR SUMMARY JUDGMENT

### A. Plaintiff's Employment with the Washington Conference

St. Stephens African Methodist Episcopal Church, Inc. ("St. Stephens") is a church located within the Washington Conference of the Second District of the AME Church. *See* Ex. A (Declaration of Bishop William P. DeVeaux, Sr.), ¶¶ 4-6. Plaintiff was appointed as pastor of St. Stephen's in 1988 and remained as a pastor until she was placed on administrative leave in 2015. *Id.*, ¶ 10; *see also* Ex. B (Deposition Testimony of Alicia Byrd, Ph.D.), at 22-23.

### B. St. Stephens' Financial Troubles

At the beginning of 2015, Bishop DeVeaux first learned that St. Stephens was at imminent risk of foreclosure. Ex. A, ¶ 12. The foreclosure sale was scheduled to occur on March 11, 2015. *Id.* Bishop DeVeaux communicated with Plaintiff and leaders within the Washington Conference to obtain information about how it came to be that St. Stephens was in danger of losing the church property. *Id.* Bishop DeVeaux learned that a loan secured by the real property upon which St. Stephens is located was in default. *Id.* Bishop DeVeaux and Washington Conference leaders immediately took steps to avoid the foreclosure sale and save the St. Stephens property. *Id.*, ¶ 13. On March 10, 2015, St. Stephens filed a bankruptcy petition to stay the foreclosure proceedings. *Id.*

**C.**    **The Ministerial Efficiency Committee's Review of Plaintiff**

Given the status of the foreclosure proceedings, Bishop DeVeaux had serious concerns about how the St. Stephens church property came to be used as security for the loan and whether Plaintiff followed the proper internal church procedures for encumbering real property owned by the AME Church. *Id.*, ¶ 14. Accordingly, Bishop DeVeaux referred Plaintiff to the Washington Conference's Ministerial Efficiency Committee ("MEC"), which reviews the efficiency and moral conduct of pastors referred to the MEC. *Id.*, ¶¶ 15. Plaintiff had the opportunity to attend and present information to the MEC, which she did on two occasions. Ex. B, at 32:13-18; *see also* Ex. C (Deposition Testimony of Rev. Anna Mosby), at 13:9-18; 21:8-13. The second of those two meetings occurred at the 2015 Washington Conference Annual Conference. Ex. B, at 32:19-21. The Annual Conference is generally a meeting of church leaders within the Washington Conference to discuss various matters of import to church members and to worship together as a conference. *See* Ex. A, ¶ 8.

The MEC deliberated at the Annual Conference and issued a report containing its recommendation that Plaintiff be placed on administrative leave (the "Report"). Ex. D; *see also* Ex. I, at 23:6-18.[1] The Report contains the following statements that Plaintiff disputes:

    a.    St. Stephens AME Church did not receive permission to collateralize the Church property from the Conference Trustees

    b.    Secondly, Rev. Byrd failed to get approval by way of resolution from the quarterly conference.

    c.    Rev. Byrd was eight years delinquent in paying the mortgage leading to foreclosure resulting in a March 11th bankruptcy filing.

---

[1]    The MEC issued a second report dated March 17, 2016; however, that report is not the subject of Plaintiff's Complaint.

*Id.* As is standard practice for all committee reports issued at the Annual Conference, the Report was read aloud to church leaders and members in attendance at the Annual Conference. Ex. C, at 34:2-13.

### D. Plaintiff's Claims in This Lawsuit

On September 27, 2017, Plaintiff filed her Complaint in the Circuit Court for Prince George's County, which Defendants later removed to this Court. *See* ECF 2. Plaintiff's Complaint contains two counts: Count I – False Light Invasion of Privacy, and Count II – "Alternate Liability of Washington Conference of the Second Episcopal District of the African Methodist Episcopal Church and General Conference of the AME Church." *Id.* In her Complaint, Plaintiff claims that the statements in the MEC Report are false. Plaintiff seeks compensatory damages in the amount of Three Million Six Hundred Thousand and Five Hundred Dollars ($3,600,500.00); and punitive damages in the amount of Ten Million Eight Hundred Fifteen Thousand Dollars ($10,815,000.00). *Id.* at 22-23.[2]

---

[2]    On August 1, 2018, well after the deadline for filing amended pleadings or joining additional parties, Plaintiff filed a motion for leave to amend her complaint. *See* ECF 30. Defendants will be filing an opposition to that motion before the deadline for doing so; however, that motion should not impact the Court's decision on Defendants' motion for summary judgment because the proposed amendments would be futile as they too would fail for the reasons stated in this motion. *See Douglas v. S.C. Dep't of Highways & Pub. Transp.*, 813 F.2d 1227 (4th Cir. 1987) (denying motion to amend because plaintiff "was unable to present any evidence to support his amendment"); *Tech. Patents LLC v. Deutsche Telekom AG*, 800 F. Supp. 2d 690, 700 (D. Md. 2011) *aff'd sub nom. on other grounds by Tech. Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482 (Fed. Cir. 2012) (denying plaintiff's motion to amend because "even if the Court were to allow [plaintiff] to amend its claim charts, Defendants would still be entitled to summary judgment" and proposed amendment was therefore "futile"); *see also U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 736 n.4 (4th Cir. 1989) (stating that its "opinion must not be read as a tacit endorsement of last-second amendments alleging meritless claims in an attempt to save a case from summary judgment" and noting that "[t]rial courts should be wary of and unreceptive to such tactics").

## II.   THE APPLICABLE LEGAL STANDARD

Fed. R. Civ. P. 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "'By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Howell v. Springfield Hosp. Ctr.*, No. CIV. A. JFM-13-811, 2014 WL 1388262, at *2 (D. Md. Apr. 7, 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)) (emphasis in *Anderson*); *see also Trundle v. Homeside Lending, Inc.*, 162 F. Supp. 2d 396, 399 (D. Md. 2001) (stating that "a mere scintilla of evidence is not enough to create a fact issue") (internal citation and quotation omitted).

A "'party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Howell*, 2014 WL 1388262, at *2 (quoting *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir.2003)). Plaintiff, as the "party who bears the burden of proof on a particular claim must factually support each element of . . . her claim." *Trundle*, 162 F. Supp. 2d at 398–99. "'[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial.'" *Id.* at 399 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"'One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses,' and Rule 56 must be interpreted and applied 'in a way that allows it to accomplish this purpose.'" *Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006) (quoting *Celotex*, 477 U.S. at 324-25). In considering a motion for summary judgment,

therefore, "[t]he court must…abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Howell*, 2014 WL 1388262, at \*2 (quoting *Bouchat*, 346 F.3d at 526). Thus, "summary judgment [is] not a 'disfavored procedural shortcut,'" but rather a means to prevent the necessity and expense of preparation for trial in cases in which the trier of fact could not reasonably find for the plaintiff. *See Celotex*, 477 U.S. at 327.

## III.    ARGUMENT

### A.    The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Claims Based on the Ecclesiastical Abstention Doctrine

The First Amendment to the United States Constitution,[3] applicable to the states through the Fourteenth Amendment,[4] and Article 36 of the Maryland Declaration of Rights[5] divest civil

---

[3]    The First Amendment provides, in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I

[4]    The Fourteenth Amendment provides, in pertinent part:
> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

[5]    Articles 36 of the Maryland Declaration of Rights states:
> That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry; nor shall any person, otherwise competent, be deemed incompetent as a witness,

courts of subject matter jurisdiction over litigation involving church government, discipline, and religious faith and doctrine. Specifically, the Free Exercise Clause and the Establishment Clause (the "Religion Clauses") prevent the government from interfering in matters of internal church governance and ecclesiastical decisions, as well as matters of faith and religious doctrine. This general principle, sometimes referred to as the ecclesiastical abstention doctrine, has been recognized by the United States Supreme Court, various United States Courts of Appeals, including the Fourth Circuit, and Maryland's appellate courts. *See generally Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012) [hereinafter *Hosanna-Tabor*]; *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952); *Rayburn v. Gen. Conference of Seventh-Day Adventist*, 722 F.2d 1164, 1169 (4th Cir. 1985); *Prince of Peace Lutheran Church v. Linklater,* 421 Md. 664 (2011) [hereinafter *Linklater*]; *Montrose Christian School v. Walsh*, 363 Md. 565 (2001); *Bourne v. Center on Children*, 154 Md. App. 42 (2003); *Downs v. Roman Catholic Archbishop of Baltimore*, 111 Md. App. 616 (1996).

In determining whether a court has subject matter jurisdiction over a case involving religious issues, "the inquiry . . . in light of the applicable federal and state constitutional religious provisions . . . focuses on the facts of the lawsuit and whether the claims asserted are 'purely secular' or not." *Bourne*, 154 Md. App. at 57. If the claims are not purely secular, the

---

        or juror, on account of his religious belief, provided, he believes in the existence of God, and that under His dispensation such person will be held morally accountable for his acts, and be rewarded or punished therefor either in this world or in the world to come.
        Nothing shall prohibit or require the making reference to belief in, reliance upon, or invoking the aid of God or a Supreme Being in any governmental or public document, proceeding, activity, ceremony, school, institution, or place.
        Nothing in this article shall constitute an establishment of religion.
Md. Const. Decl. of Rts. art. 36.

Court lacks subject matter jurisdiction to hear the case. *See generally Downs*, 111 Md. App. 616 (affirming the dismissal of plaintiff's defamation claims pursuant to ecclesiastical abstention doctrine); *Bourne*, 154 Md. App. 42 (affirming summary judgment for religious organization based upon the ecclesiastical abstention doctrine); *Prioleau v. Richardson*, No. 1796 (Md. Ct. Spec. App. Dec. 17, 2012) (affirming dismissal of plaintiff's false light invasion of privacy, defamation, and intentional infliction of emotional distress claims because court lacked subject matter jurisdiction based on the First Amendment) (attached hereto as Exhibit E); *see also Patton v. Jones*, 212 S.W.3d 541, 547-48 (Tex. App. 2006).

In determining whether an issue is a religious or purely secular one, courts have recognized that "religious organizations require 'an independence from secular control or manipulation – in short, power to decide for themselves, free from state interference, matters of church government, as well as those of faith and doctrine.'" *Bourne*, 154 Md. App. at 52-53 (quoting *Kedroff*, 344 U.S. at 116). Specifically, "the First Amendment provides religious institutions with significant freedoms with regard to matters concerning "'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them.'" *Downs*, 111 Md. App. at 622 (quoting *Watson v. Jones*, 80 U.S. 679, 733 (1871)). "'The purpose of this exclusion is to free civil courts completely from entanglement in questions of religious doctrine, polity and practice.'" *Bourne*, 154 Md. App. at 53 (quoting *Downs*, 111 Md. App. at 622). ""Even where the dispute actually presented to the court is one that, if presented by any other set of litigants, would clearly be justiciable, if the resolution of that dispute between the litigants at hand would require the court to adjudicate matters of church doctrine or governance, or to second-guess ecclesiastical

decisions made by a church body created to make those decisions, the matters falls outside the court's authority."" *Id.* (quoting *Downs*, 111 Md. App. at 622).

Moreover, when dealing with claims such as false light invasion of privacy, "questions of truth, falsity, [and] malice . . . often take on a different hue when examined in the light of religious precepts and procedures . . . ." *Downs*, 111 Md. App. at 624. "When allegedly defamatory statements are made during the process of determining fitness for religious leadership positions, even if the statements are invalid and unfair, such speech is protected through the ambit of the First Amendment freedom of religion provisions." *Bourne*, 154 Md. App. at 56. Claims such as false light invasion of privacy and defamation require review of the church's stated reason for the discharge, which is "an essentially ecclesiastical concern." *Black v. Snyder*, 471 N.W.2d 715, 720 (Minn. Ct. App. 1991), *cited with approval by Linklater*, 421 Md. at 689.

The Supreme Court has recognized that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom or law have been decided by the highest of church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them." *Hosanna-Tabor*, 565 U.S. at 186 (internal citations omitted). Furthermore, the Court explained that:

> [T]he First Amendment permits hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters . . . by inquiring into whether the Church . . . followed its own procedures, [civil courts] unconstitutionally undertake[] the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals of the Church.

*Id.* at 187 (internal citations omitted).

Here, Plaintiff's claims for false light invasion of privacy are based upon the alleged actions of the Washington Conference, the AME Church, and Bishop DeVeaux in connection with referring Plaintiff to the church's MEC and in publishing the Report issued after the MEC's review of whether Plaintiff complied with internal AME Church policies and procedures. Plaintiff contends that the statements contained in the MEC's Report were false because the Doctrine and Discipline of the African Methodist Episcopal Church (the "Discipline"), which are "the operating rules for the church" (*see* Ex. B, at 29:6-15), did not require her to take the actions described in the Report. Plaintiff also contends that in connection with the MEC's deliberations regarding the St. Stephens matter, the Defendants did not follow the policies and procedures set forth in the Discipline.

These issues would require the Court to interpret the Discipline, determine whether the MEC followed the internal church policies and procedures set forth in the Discipline, and determine whether Plaintiff complied with the internal church policies and procedures set forth in the Discipline for obtaining a mortgage on church-owned property. Indeed, at the depositions of the MEC members and other church leaders, they were repeatedly questioned by Plaintiff's counsel regarding their understanding of the Discipline. *See, e.g.*, Ex. C, at 9:5-20, 12:2-13; Ex. F (Deposition Testimony of Rev. Michelle Langston), at 14:17 to 15:14, 23:17 to 24:11, 30:4 to 32:20, 61:15 to 62:18; Ex. G (Deposition Testimony of Rev. Ronald Braxton), at 10:6 to 11:21, 19:3-21, 23:14-20, 27:18-20, 29:1-9; Ex. H (Deposition Testimony of Rev. Grainger Browning), at 8:19 to 9:10, 17:18 to 18:11, 37:5-21; Ex. I (Deposition Testimony of Rev. Lee P. Washington), at 8:14-20, 26:4 to 28:5; Ex. J (Deposition Testimony of Rev. William H. Lamar, IV), at 9:4-9, 11:12-21, 17:5 to 18:21, 28:7 to 29:15, 39:15 to 41:5; Ex. K (Deposition Testimony

of Rev. Henry Young White), at 8:9-17, 23:2-8.[6] Accordingly, Plaintiff's claim is a matter concerning "theological controversy, church discipline, ecclesiastical government, [and] the conformity of the members of the church to the standard of morals required of them." *Bourne*, 154 Md. App. at 53 (internal citations omitted).

This Court, therefore, does not have subject matter jurisdiction over Plaintiff's claims because doing so would require the court to (1) interject secular law into matters of AME Church governance, discipline and administration; (2) inquire into the Church's process of determining who can continue on as clergy and the fitness of its clergy; and (3) engraft common law duties upon ecclesiastical relationships. All of these matters are explicitly exempt from consideration by civil courts by virtue of the First Amendment's Religion Clauses and the Maryland Declaration of Rights. Put simply, Plaintiff's Complaint asks that a civil court rule upon matters that fall squarely within the freedoms guaranteed by the First Amendment.

**B.      Plaintiff's Claims Are Barred by the Ministerial Exception Doctrine**

Plaintiff's claims in this lawsuit involve issues of how the AME Church makes employment decisions, pastoral assignments and reviews pastoral qualifications.[7] Although she

---

[6]      As of the filing of this memorandum, Defendants have not yet received a copy of the transcript of the deposition of the MEC Chair, Rev. Michael Bell; however, Rev. Bell was asked similar questions regarding the Discipline, and Defendants can supplement their memorandum with that deposition testimony when they receive the transcript from the court reporter.

[7]      Importantly, Plaintiff consented to be governed by church procedures based on her voluntarily decision to join the church's clergy as a pastor. The Supreme Court has said:

> The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one

has pled her claim as one for false light invasion of privacy, her allegations and the damages she seeks make clear that the crux of her complaint is that she was removed from her position as pastor. Plaintiff's claims, therefore, are barred by the ministerial exception.[8]

The Supreme Court and Maryland courts alike have recognized a ministerial exception that applies to employment-related decisions regarding church employees and pastoral qualifications. *See, e.g., Hosanna-Tabor*, 565 U.S. 171; *Linklater*, 421 Md. 664; *see also Rayburn*, 722 F.2d at 1169; *Montrose Christian*, 363 Md. at 590-91, 597. Pursuant to the ministerial exception, such employment-related decisions are protected because "governmental interference with a church's ability to select and manage its own clergy would violate both the Free Exercise Clause and the Establishment Clause of the First Amendment." *Montrose Christian*, 363 Md. at 591 (internal quotation omitted). Because religious organizations, such as the AME Church, are protected from governmental interference by the constitutional prohibitions against excessive entanglement, a court cannot use the common law to interfere with employment and disciplinary decisions of religious organizations, when the decision complained

---

        aggrieved by one of their decisions could appeal to the secular
        courts and have them reversed. It is of the essence of these
        religious unions, and of their right to establish tribunals for the
        decision of questions arising among themselves, that those
        decisions should be binding in all cases of ecclesiastical
        cognizance, subject only to such appeals as the organism itself
        provides for.

*Kedroff*, 344 U.S. at 114–15 (internal quotation and citation omitted). Consequently, by joining the AME Church's clergy, Plaintiff agreed to be governed by the AME Church processes for review of her qualifications and status as a clergy member.

[8]    The Supreme Court has said that the ministerial exception "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar. That is because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case.'" *Hosanna-Tabor*, 565 U.S. at 195 n.4 (quoting *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 254 (2010) (internal quotation marks omitted)).

of involves consideration of an internal church decision that affects the faith and mission of the church.

In applying the ministerial exception, the Supreme Court has said that "the purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone." *Hosanna-Tabor*, 565 U.S. at 194–95 (internal quotation and citation omitted); *see also Melhorn v. Baltimore Washington Conference of United Methodist Church*, No. 2065, 2016 WL 1065884, at *4 (Md. Ct. Spec. App. Mar. 16, 2016), *cert. denied sub nom. Melhorn v. Baltimore-Washington Conference*, 448 Md. 31 (2016), *cert. denied*, 137 S. Ct. 377 (2016). In discussing the importance of the ministerial exception, the Supreme Court stated:

> The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through appointments. According the state power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Hosanna-Tabor*, 565 U.S. at 188.

"For the ministerial exception to bar a claim, two factors must be present: the employer must be a religious institution, and the employee must have been a ministerial employee." *Curl v. Beltsville Adventist Sch.*, No. GJH-15-3133, 2016 WL 4382686, at *8 (D. Md. Aug. 15, 2016). Here, it is undisputed that the AME Church and the Washington Conference are religious institutions (Ex. A, ¶ 23), and that Plaintiff was a ministerial employee (Ex. B, at 22:8 to 23:18).

Furthermore, the Court cannot determine if certain of the statements in the Report are false without having to make a determination as to what the AME Church's policies are procedures are and whether Plaintiff complied with those policies and procedures. "Such a determination is of the precise type that the ministerial exception precludes secular courts from making." *Melhorn*, 2016 WL 1065884, at *5.

Thus, Defendants are entitled to judgment as a matter of law based on the ministerial exception.

### C. The Undisputed Facts Demonstrate that Plaintiff Cannot Prove Her Claim for False Light Invasion of Privacy

Even assuming *arguendo* that the Court has jurisdiction to hear the case (it does not), Plaintiff cannot carry her burden of establishing each of the elements of her false light invasion of privacy claims against each of the Defendants. Those elements are:

> 1) that the defendant gave "publicity to a matter concerning another that places the other before the public in a false light," 2) that "the false light in which the other person was placed would be highly offensive to a reasonable person," and 3) that "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

*Davidson-Nadwodny v. Wal-Mart Assocs., Inc.,* No. CIV. A. CCB-07-2595, 2008 WL 2415035, at *5 (D. Md. June 3, 2008) (quoting *Bagwell v. Peninsula Regional Medical Center,* 106 Md. App. 470, 513–14 (1995)); *see also Wuenschel v. Kristoff,* No. CV JKB-17-1446, 2017 WL 3414040, at *3 (D. Md. Aug. 9, 2017); *Holland v. Psychological Assessment Res., Inc.*, 482 F. Supp. 2d 667, 681 (D. Md. 2007).

Here, Plaintiff cannot carry her burden of proof as to any of these elements.

1.  **The Report Was Not Made to the Public at Large**

Plaintiff's false light invasion of privacy claim fails as a matter of law because the alleged disclosure about which Plaintiff complains—the reading of the Report—was not the disclosure of "'private facts to the 'public at large.'" *Davidson-Nadwodny*, 2008 WL 2415035, at *5 (quoting *Mazer v. Safeway, Inc.*, 398 F. Supp. 2d 412, 431 (D. Md. 2005)); *see also Meaney v. Nationstar Mortg.*, No. CV TDC-16-2959, 2018 WL 1014927, at *14 (D. Md. Feb. 21, 2018) (stating that "a false light claim requires a defendant to communicate 'to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge'") (quoting *Cambridge Title Co. v. Transamerica Title Ins. Co.*, 817 F. Supp. 1263, 1278 (D. Md. 1992)); *Rangarajan v. Johns Hopkins Health Sys. Corp.*, No. CIV.A. WMN-12-1953, 2014 WL 6666308, at *6–7 (D. Md. Nov. 21, 2014).

Here, it is undisputed that the Report did not contain private facts about Plaintiff. Rather, the Report contained facts about the church's internal affairs and the matters that occurred with the St. Stephens church and church property. *See* Ex. D. Furthermore, the Report was not published to the public at large, nor was it read in front of the general public. *See* Ex. A, ¶¶ 20-21; Ex. C, at 34:2-13. Rather, consistent with internal church policies and procedures, it was provided only internally to church members in attendance at the Annual Conference, where it was read aloud by a member of the MEC. *See* Ex. A, ¶¶ 20-21; Ex. C, at 34:2-13. Thus, there was no publication to the public at large or to so many non-church members that it should be regarded as certain to become a matter of public knowledge. Rather, the Report was the church's internal publication and was not shared with anyone other than its own members in attendance at the Washington Conference and remained an internal church publication.

### 2.    The Report Was Not Highly Offensive to a Reasonable Person

Plaintiff's claims also fail as matter of law because the Report does not contain statements that would be highly offensive to a reasonable person. Although "numerous 'misrepresentations and alleged [false] facts,'" may be sufficient to satisfy the highly offensive statement, a "single allegation of falsehood" is not. *KDSTI Slassie Tewahdo Church v. Ghebreamlak*, No. CV DKC 2007-0863, 2008 WL 11366449, at *7 (D. Md. July 17, 2008) (quoting *Ostrzenski v. Seigel*, 177 F.3d 245, 252 (4th Cir. 1999)). Here, Plaintiff's claim does not concern numerous alleged false statements or misrepresentations, it is focused solely on the Report. At most, the Report contains two statements about which Plaintiff complains: (1) that she was eight years delinquent in paying the SSEDC mortgage; and (2) that she failed to get proper church approval before obtaining the mortgage. Such isolated statements contained in a single report do not satisfy the highly offensive element of a false light invasion of privacy claim.

### 3.    The Report Was Not Made With Knowledge that it was False or with Reckless Disregard for the Truth

An essential requirement to proving the false light claim is that Plaintiff prove that Defendants had knowledge of or acted in reckless disregard of the publicized matter placing Plaintiff in a false light. *Davidson-Nadwodny*, 2008 WL 2415035, at *5 (quoting *Bagwell,* 106 Md. App. at 513–14).

Knowledge of, or reckless disregard as to, falsity is also known as the actual malice standard. *See Bagwell*, 106 Md. App. at 512-13. Actual malice is established "where the plaintiff shows that the defendant published the statement in issue either with reckless disregard for its truth of with actual knowledge of its falsity." *Id* at 512 (affirming summary judgment for defendants) (internal citation omitted).

Reckless disregard is a substantially higher hurdle than negligence. Specifically,

"Actual malice" cannot be established merely by showing that the publication was erroneous, derogatory or untrue; the publisher acted out of ill will, hatred or a desire to injure...; the publisher acted negligently; the publisher acted in reliance on the unverified statement of a third party without personal knowledge of the subject matter of the defamatory subject; or the publisher acted without undertaking the investigation that would have been made by a reasonably prudent person. Moreover, malice is not established if there is evidence to show that the publisher acted on a reasonable belief that the defamatory material was "'substantially correct'" and "there was no evidence to impeach the [publisher's] good faith," *New York Times Co. v. Sullivan*, 376, U.S. 254, 286, (1964).

*Bagwell*, 106 Md. App. at 512-13 (quoting *Capital-Gazette Newspapers, Inc. v. Stack*, 293 Md. 528, 539-40 (1982)).

Plaintiff has failed to provide *any* evidence that any Defendant made a statement in the Report with either actual knowledge or reckless disregard for the truth of the statements contained herein under the heightened standard articulated above. Not a single MEC member testified that Bishop DeVeaux or any other church employee or agent knew at the time the Report was issued that any statement therein was false. Moreover, the testimony of the MEC members reveals that the Report was not created with reckless disregard for the truth of the matters contained therein. The Report was issued after Plaintiff had the opportunity to speak with and present documents to the MEC, the MEC spoke with members of Plaintiff's church regarding the matters, and the MEC had a chance to deliberate regarding the issues concerning Plaintiff. *See, e.g.,* Ex. B, at 32:10-18; Ex. C, at 13:8-18, 15:2-8, 21:3-11, 23:10-21; Ex. F, at 38:17 to 39:11. As such, the MEC operated under a reasonable belief that the statements in question were substantially correct. *See, e.g.*, Ex. C at 24:5 to 26:16; Ex. F, at 48:21 to 50:14. Further, Plaintiff has demonstrated no evidence impeaching the MEC's or Bishop DeVeaux's subjective good faith belief as to the truth of the Report's contents.

Accordingly, Plaintiff's false light invasion of privacy claim fails as a matter of law.

### 4. Bishop DeVeaux Did Not Make or Publicize the Report, and Therefore, He Did Not Place Plaintiff in a False Light

In pursuing a false light claim against Bishop DeVeaux, Plaintiff attempts to obtain redress against an individual who neither made nor publicized the statements in the Report. It is undisputed that Bishop DeVeaux did not participate in the investigation or deliberations of the MEC. Ex. A, ¶¶ 16-17; Ex. C, at 27:17 to 28:5; Ex. F, at 51:10-17; Ex. H, at 20:9-10; Ex. I, at 33:2-5; Ex. J, at 13:15-18, 33:3-17. Bishop DeVeaux merely referred Plaintiff to the MEC for investigation. Ex. A, ¶ 15. He did not formulate or draft the conclusions reached by the MEC in its Report, nor did he personally publicize the relevant statements in the Report. *Id.*, ¶ 18. A member of the MEC read the Report to attendees of the Washington Annual Conference. Ex. C, at 34:2-7. As Bishop DeVeaux did not make the Report nor publicize any of the statements in question, he simply cannot be individually liable under a false light claim.

### D. Plaintiff's Claims Are Barred by the Common Interest Conditional Privilege

Assuming solely for the purpose of argument that Plaintiff can establish a prima facie false light claim, the claim still fails as a matter of law because Defendants enjoy a common law conditional privilege: the common interest privilege.[9]

In describing the privilege, Maryland courts have explained that:

> "[c]ommon interests are usually found among members of
> identifiable groups in which members share similar goals or values

---

[9] There are four common law conditional privileges: (1) the public interest privilege, to publish materials to public officials on matters within their public responsibility; (2) the privilege to publish to someone who shares a common interest, or relatedly, to publish in defense of oneself or in the interest of others; (3) the fair comment privilege; and (4) the privilege to make a fair and accurate report of public proceedings. *Seley-Radtke v. Hosmane*, 450 Md. 468, 492-93 (2016).

> or cooperate in a single endeavor....The idea is to promote free
> exchange of relevant information among those engaged in a
> common enterprise or activity and to permit them to make
> appropriate internal communications and share consultations
> without fear of suit . . . ."

*Seley-Radtke*, 450 Md. at 493 (quoting *Gohari v. Darvish*, 363 Md. 42, 57 (2001)). Further, "a

common interest may include interests in property, business and professional dealings, and can

inhere in business dealings between the publisher and the recipient." *Id.* at 493 (internal citations

omitted).

Importantly, Maryland case law widely recognizes that communications arising out of the

employer-employee relationship, even as far as accusing employees of criminal activity, "clearly

enjoy a qualified privilege." *McDermott v. Hughley*, 317 Md. 12, 28-29 (1989); *see e.g. General*

*Motors Corp. v. Piskor*, 277 Md. 165 (1976) (statements accusing auto assembly plant employee

of theft granted conditional privilege); *Jacron Sales Co. v. Sindorf*, 276 Md. 580 (1976),

*overruled on other grounds by Le Marc's Mgmt. Corp. v. Valentin*, 349 Md. 645 (1998)

(statements accusing former employee of theft granted conditional privilege); *Hanrahan v. Kelly*,

269 Md. 21 (1973) (letter charging partner with impropriety held privileged); *Peurifoy v.*

*Congressional Motors*, 254 Md. 501 (1969) (statements charging car dealership employee with

mismanagement held privileged); *Stevenson v. Baltimore Club*, 250 Md. 482 (1968), *overruled*

*on other grounds by Marchesi v. Franchino*, 283 Md. 131 (1978) (statements by baseball team

owner as to reasons for ticket sellers' discharge were qualifiedly privileged); *Henthorn v.*

*Western Md. R.R.Co.*, 226 Md. 499 (1961) (railroad employee accused of theft and fired-charge

granted qualified privilege); *Beeler v. Jackson*, 64 Md. 589 (1886) (statements by employer

accusing railroad employee of theft were qualifiedly privileged).

Though conditional privileges typically appear in the litigation of defamation claims, "[a]n allegation of false light must meet the same legal standards as an allegation of defamation." *Piscatelli v. Van Smith*, 424 Md. 294, 306 (2012) (internal citations omitted). "Additionally, a qualified privilege that would shield a defendant from liability for defamation applies equally to a claim of false light invasion of privacy." *Lindenmuth v. McCreer*, 233 Md. App. 343, 367 (2017) (internal citations omitted).

The facts of the case at bar overwhelmingly demonstrate the hallmarks for application of the common interest privilege. First, the parties to this case were, at all times relevant to the Complaint, members of a clearly identifiable group in which members share similar goals or values or cooperate in a single endeavor: the AME Church. Plaintiff was a pastor within the AME Church for decades. Ex. B, at 22:8 to 23:18. Bishop DeVeaux is a retired Bishop of the AME Church and former presiding Bishop of the Second Episcopal District within the Church. Ex. A, ¶ 1. Each of the members of the MEC, including the individuals deposed by Plaintiff, are pastors or elders within the greater AME Church. Ex. C, at 6:9-19; Ex. F, at 8:13 to 9:4; Ex. G, at 7:2-8; Ex. H, at 6:6-14; Ex. I, at 5:17-18; Ex. J, at 6:4-8; Ex. K, at 6:4-7. The Washington Conference is an entity within the Second Episcopal District of the AME Church. Ex. A, ¶¶ 4-5. AME Church is the corporate entity of the greater AME Church. *Id.*, ¶ 22. As all of these individuals and entities are members of the same church, there can be no dispute as to the existence of an identifiable group which shares similar goals and values for purposes of determining the applicability of the common interest privilege.

Second, the specific statements at issue in this case which form the basis of Plaintiff's false light claim, are undeniably issues of property and business, which Maryland law recognizes as categories of issues in which common interests may arise. *See Seley-Radtke*, 450 Md. at 493

("[A] common interest may include interests in property, business and professional dealings, and can inhere in the business dealings between the publisher and the recipient."). The central factual issue giving rise to the statements in question in this case is whether or not church property was collateralized without proper authority and whether Plaintiff placed church property at risk of foreclosure. *See* Ex. D. It is difficult to conceive of a clearer area of common interest shared among members of a church than the proper stewardship and protection of church property.

Third, the publication of the statements itself was made by a church pastor to other members of the church. *See* Ex. C, at 34:2-13. Importantly, the statements were published at an internal church event: the 2015 Washington Annual Conference. *See id.*; *see also* Ex. A, ¶¶ 20-21.

Finally, because Defendants have established the existence of the common interest conditional privilege, Plaintiff bears the burden of proving facts that would support a finding of malice. *See Piscatelli*, 424 Md. at 308. While malice is usually a question for the fact-finder, it need not be submitted to the fact-finder when the plaintiff fails to allege or prove facts that would support a finding of malice. *Id.* Importantly, malice is defined as "a person's actual knowledge that his [or her] statement is false, coupled with his [or her] intent to deceive another by means of that statement." *Id.* at 307-08. Plaintiff has demonstrated no evidence whatsoever that Bishop DeVeaux had knowledge of the alleged falsity of any of the statements in question, or more importantly, that Bishop DeVeaux specifically intended to deceive anyone. Notably, Bishop DeVeaux did not even make the statements in question.[10] Ex. A, ¶¶ 17-18.

---

[10]     By attempting to prejudicially amend her Complaint at this late stage of the proceedings to add as parties the members of the MEC, Plaintiff has implicitly conceded that it was the MEC,

For all of the reasons stated above, the common interest privilege applies to bar Plaintiff's false light claim as a matter of law.

### E. AME and the Washington Conference Are Entitled to Judgment as a Matter of Law as to Plaintiff's Count II for Vicarious Liability

In Count II of her Complaint, Plaintiff purports to allege a claim for "Alternate Liability" of the AME Church and the Washington Conference. *See* ECF 2, at 21-22. In that count, Plaintiff alleges that the AME Church and the Washington Conference are "vicariously responsible and liable" for the actions of Bishop DeVeaux. *Id.*, ¶ 91. Accordingly, in Count II, Plaintiff is asserting a *respondeat superior* claim. "*Respondeat superior,* however, is not a separate cause of action, but rather is a doctrine that permits the imputation of liability on a principal or employer for the act of an agent or employee." *Davidson-Nadwodny*, 2008 WL 2415035, at *5. Accordingly, the AME Church and the Washington Conference are entitled to judgment as a matter of law as to Count II. *See id.* (dismissing *respondeat superior* claim when raised as a separate cause of action).

Even assuming *arguendo*, that Plaintiff could raise the *respondeat superior* theory as a separate claim, her claim would fail as a matter of law. Plaintiff seeks to impose liability on the AME Church and the Washington Conference based on the conduct of Bishop DeVeaux. Because Plaintiff's claim against Bishop DeVeaux fails as a matter of law, *supra* §§ III.A.-III.D., her *respondeat superior* claims against the AME Church and the Washington Conference likewise fail.

---

rather than Bishop DeVeaux, who issued the Report. As noted above, *supra* n.2, Plaintiffs' purported claims against the MEC members would also fail as a matter of law.

**F.  Defendants Are Entitled to Judgment as to Plaintiff's Request for Punitive Damages**

In her Complaint, Plaintiff seeks ten million, eight hundred and fifteen thousand dollars ($10,815,000.00) in punitive damages.  Under Maryland law, a finder of fact may award punitive damages only in rare and exceptional cases involving "'particularly heinous, egregious and reprehensible conduct.'"  *See Schaefer v. Aetna Life & Cas. Co.*, 910 F. Supp. 1095, 1101 (D. Md. 1996) (quoting *Montgomery Ward v. Wilson*, 339 Md. 701, 734 (1995)).  Thus, to win punitive damages, a plaintiff must show by clear and convincing evidence that the defendant acted with "actual malice." *Id.* at 1100-01 (citing *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 460, 469 (1992)); *see also LeMarc's Mgmt. Corp.,* 349 Md. at 654 (stating that plaintiff would need to establish "by clear and convincing evidence, that the defendant had the requisite mens rea, *i.e.,* actual knowledge, to support such an award").

In general, "actual malice" means "a person's actual knowledge that his or her statement is false, coupled with his or her intent to deceive another by means of that statement." *See Seley-Radtke*, 450 Md. at 496 (citation and quotations omitted).  Thus, to recover punitive damages in a defamation action, a plaintiff must establish, *inter alia*, that the defendant made the defamatory falsehood with actual knowledge that it was false. *See Bowden v. Caldor, Inc.*, 350 Md. 4, 23 (1998) (citing *LeMarc s Mgmt. Corp.*, 349 Md. at 655; *Telnikoff v. Matusevitch*, 347 Md. 561, 594-95 (1997)).

Here, Plaintiff has not provided any evidence, let alone clear and convincing evidence, that any Defendant had actual knowledge that any statement in the Report was false at the time it was made. *See, supra*, § III.C.3.  Rather, Plaintiff relies solely on her own speculative allegations, which are insufficient to withstand a motion for summary judgment. *See, e.g., Howell*, 2014 WL 1388262, at *2 (stating that a "party opposing a properly supported motion for

summary judgment may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial") (internal quotation and citation omitted). Accordingly, even if the Court permits Plaintiff to proceed with her claims in this case (it should not), Defendants are entitled to summary judgment as to her request for punitive damages.

## IV.    CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of each of the Defendants as to each of Plaintiff's claims.

Respectfully submitted,

Dated:  August 6, 2018.

*/s/ Catherine M. Manofsky*
Brian S. Goodman (Bar No.: 03212)
Catherine M. Manofsky (Bar No.: 16119)
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
(410) 752-6030 (telephone)
(410) 539-1239 (facsimile)
bgoodman@kg-law.com
cmanofsky@kg-law.com

*Attorneys for Defendants Washington Annual Conference of the African Methodist Episcopal Church and Bishop William P. DeVeaux, Sr.*

*/s/ Andrew J. Chiang*
Andrew J. Chiang (Bar No. 18142)
O'HAGAN MEYER, PLLC
2560 Huntington Avenue, Suite 204
Alexandria, VA 22303
(703) 775-8602
achiang@ohaganmeyer.com

*Attorney for Defendants Bishop William P. DeVeaux, Sr. and African Methodist Episcopal Church, Inc.*