IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

_____

Reverend Alicia Byrd, Ph.D.

                                      :

        Plaintiff,              :

       vs.                      :

                                 Case No. DKC 17-3251

Bishop William P. DeVeaux, et al.  :

                                    :

        Defendants.

_____

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
### FOR SUMMARY JUDGMENT

    Plaintiff Reverend Alicia Byrd, Ph.D., by and through her attorneys Bernard C. Coleman, Jr. and Coleman & Hearns, LLC., files this motion in opposition to Defendants motion for summary judgment.  In support of this motion, Plaintiff has attached an affidavit, exhibits and Memorandum of Points and Authorities.


                         Respectfully submitted,


                         COLEMAN & HEARNS, LLC

                         /s/Bernard C. Coleman, Jr.
                         Bernard C. Coleman, Jr.(10502)
                         1401 Mercantile Lane
                         Suite 104
                         Upper Marlboro, Maryland 20774
                         (301) 567 1920

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

_____

Reverend Alicia Byrd, Ph.D.

                                           :

        Plaintiff,               :

        vs.                    :

                                  Case No. DKC 17-3251

Bishop William P. DeVeaux, et al.  :

                                 :

        Defendants.

_____

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Plaintiff Reverend Alicia Byrd, Ph.D., by and through her attorneys Bernard C. Coleman, Jr. and Coleman & Hearns, LLC., hereby submit this Statement of Material Facts pursuant to FRCP 56 and Local Rule 105 in opposition to Defendants' motion for summary judgment.

1.  That the Plaintiff filed an action for false light invasion of privacy in the Circuit Court for Prince George's County, Maryland on September 27, 2017.

2.  That the Defendants filed a Notice of Removal with this Court on November 3, 2017.

3.  That the Plaintiff on December 1, 2017 filed a motion to remand.

4.  That the Court denied the motion to remand on January 5, 2018.

5.  Reverend Alicia Byrd, Ph.D., was Class A pastor within the African Methodist Episcopal Church and was a Class A pastor within the AME Church since 1988. Plt.'s Comp., para. 11, Byrd Depo. 23:3. Exhibit D

6.  Dr. Byrd was appointed to St. Stephens AME Church in Elkridge, Maryland in June of 1988 and was reappointed as pastor to the same charge annually until April 15, 2015 when she was placed on administrative leave by Bishop William P. DeVeaux, Sr. Plt.'s Comp., para. 12., Byrd Depo. 23:7-12. Exhibit D

7.  Dr. Byrd and members of St. Stephens AME Church burned a church mortgage in 1992 and began to seek ways that the church could expand their church meeting and ministry spaces.  Plt.'s Comp. para. 13; Byrd Aff., para. 4., Exhibit A

8.  The St. Stephens Economic Development Corporation was formed in February 1988 to raise funds from public, private and foundation sources for the construction of the St. Stephens Child Care and Community Center on its property at 7741 Mayfield Avenue.  St. Stephens AME church and community members served on the board of directors of the St. Stephens Economic Development Corporation.  Plt's

Comp., para 14; Bryd Depo., 53:14; Bryd Aff., para. 5.,
Exhibits A & D

9.  That central to the church's plans were to provide
affordable child care for low-income to moderate income
families residing in Howard County and the nearby counties
in order to improve the economic conditions of these
families.  Plt's Comp., para. 15; Byrd Depo. 73:1-6; Byrd
Aff., para. 6. Exhibits A & D

10.  The church members voted on January 30, 1994 to build
a ministry building adjacent to St. Stephens AME Church.
Plt's Comp., para. 16; Byrd Aff., para. 7. Exhibit A

11.  St. Stephens AME church members, county leaders and
licensed contractors worked on committees to plan the
childcare building and the child care program that would
help to pay for the construction and debt service (if
required) for this building called the St. Stephens Child
Care and Community Center.  Plt's Comp., para. 17; Byrd
Aff., para. 8. Exhibit A

12.  That in the course of gaining the necessary approvals
to redevelop its site located at 7741 Mayfield Avenue, in
Elkridge, Maryland, Pastor Byrd and the St. Stephens
Church Trustees discovered its deed only recorded a grant
to St. Stephens AME Church of .5 acres of land and not the
1.087 acres St. Stephens AME Church had continuously used

4

and maintained for over twenty (20) years.  Plt's Comp.,
para. 18; Byrd Aff., para. 9. Exhibit A.

13.  St. Stephens AME Church members reported the granting
of the additional .587 acres early in the 20th century,
however, this grant was never recorded.  Plt's Comp.,
para. 19; Byrd Aff., para. 10. Exhibit A

14.  That in order to clear its title and to settle an
unrecorded legal claim by Reverend Roland Howard, Pastor
Byrd and the St. Stephens AME Church Board of Trustees
executed a confirmatory deed in the Circuit Court for
Howard County for the unrecorded land grant under adverse
possession in October 2000.  Plt's Comp., para. 20; Byrd
Aff., para. 11. Exhibit A

15.  From 1994 to 2006 the St. Stephens AME Church and St.
Stephens Economic Development Corporation initiated plans
and fundraising activities for an eight thousand square
foot day care center that would serve children from six
weeks of age to eighteen years of age.  Plt's Comp., para.
21; Byrd Aff., para. 12. Exhibit A

16.  On February 5, 1998 St. Stephens AME Church was
granted a license to build parking spaces on .5 acres of
county land located behind the church.  This lease would
allow access and egress to the church and the day care
center on the ground and upper levels of its site and

obviate the need to construct an elevator to both levels
of the child day care and future church building.  Plt's
Comp., para. 22; Byrd Aff., para. 13. Exhibit A

17.  On October 17, 1999 St. Stephens AME Church entered
into a ground lease with the St. Stephens Economic
Development Corporation to build the child care/community
building on .25 acres of its land.  Under this lease the
church retained ownership of the property and the St.
Stephens Economic Development Corporation would own the
building in order to attract funding from government and
foundation sources.  Plt's Comp., para. 23; Byrd Aff.,
para. 14; Byrd Depo. 53:13-21; 54:1-3. Exhibits A & B

18.  To close the funding on this project, the State of
Maryland Economic Development Corporation issued a
$1,350,000 revenue bond to St. Stephens Economic
Development Corporation, sold through the Columbia Bank.
Plt's Comp., para. 24; Byrd Aff., para. 24. Exhibit A

19.  A ground breaking ceremony was conducted by Bishop
Vinton Anderson on March 17, 2001 for the child care and
community building and in attendance were Presiding Elder
Godwin Douglas, ministers of the Washington Conference of
the AME Church, church members and community leaders.
Plt's Comp., para. 25; Byrd Aff., para. 16. Exhibit A

20.   That the proceeds of the bond were loaned to St. Stephens Economic Development Corporation through draws initiated by the construction contractor; approved by the St. Stephens Economic Development Corporation and finally approved by an officer of the Columbia Bank. Plt's Comp., para. 25; Byrd Aff., para. 16. Exhibit A

21.   That funds were disbursed based on costs incurred by the contractor each month and the bond proceeds were used to construct the child care center on the Mayfield property.  Plt's Comp., para 27; Byrd Aff., para. 18. Exhibit A

22.   The loan was secured by a guarantee from the Maryland Economic Development Corporation (the "as built" child care center) and a deed of trust on St. Stephens AME Church at 7741 Mayfield Avenue, in Elkridge, Maryland. Plt's Comp., para. 28; Byrd Aff., para. 19. Exhibit A

23.   A dedication ceremony for the St. Stephens Child Care Center was held on October 21, 2006 and Bishop Adam J. Richardson officiated, Presiding Elder Goodwin Douglas presided with representatives of the Columbia Bank, United States Department of Health and Human Services, conference pastors, community leaders, church members and friends were present for the dedication service.  Plt's Comp., para. 29; Byrd Aff., para. 20. Exhibit A

24.   That in  mid-June 2010 as a result of the downturn in
the U.S. economy combined with the loss of funds because
of fraud by two vendors of the St. Stephens Economic
Development Corporation, the St. Stephens Economic
Development Corporation failed to make a couple of
payments according to the terms of the loan.  Plt's Comp.,
para. 30; Byrd Aff., para. 21; Byrd Depo. 101:19-21;
102:1-14. Exhibits A & B

25.   That in turn St. Stephens AME Church was unable to
make the payments due to its own loss of revenue.  Plt's
Comp., para. 31; Byrd Aff., para. 22. Exhibit A

26.   In 2010-2011 Reverend Byrd and the St. Stephens
Economic Development Corporation worked with the Columbia
Bank to modify its loan and sought assistance through
Presiding Elder Godwin Douglas.  Reverend Byrd sought
financial assistance in the sum of $100,000.00 from
several pastors of the Washington Conference to complete
the loan modification.  Plt's Comp., para 32; Byrd Aff.,
para. 23; Byrd Depo. 35:16-21; 41:8-10 Exhibits A B H

27.   There was no response from the pastors of the
Washington Conference.  Plt's Comp., para 33; Byrd Aff.,
para. 24. Exhibit A

28.   The Columbia Bank agreed to the loan modification but
failed to complete the necessary documents to finalize the

modification.  Plt's Comp., para. 34; Byrd Aff., para. 25.
Exhibit A

29.  That in 2013 Presiding Elder Goodwin Douglas provided
the name of Bruce Martin who was a financial consultant to
assist St. Stephens AME Church. Plt's Comp., para. 35;
Byrd Aff., para. 26; Byrd Depo. 134:15-21; 135:1-2.
Exhibits A & D

30.  Columbia Bank subsequently transferred its loan and
collateral to Acquired Capital II, LLP in July 2012.
Plt's Comp., para. 36; Byrd Aff., para. 27. Exhibit A

31.  The St. Stephens Economic Development Corporation
made eight monthly payments of $4200 and then continued to
make monthly payments of $6,000 to Acquired Capital until
late 2014 when St. Stephens Economic Development
Corporation was notified that the child care building was
put into foreclosure sale status. Plt's Comp., para. 37;
Byrd Aff., para. 28. Exhibit A

32.  That on December 13, 2003, St. Stephens Development
Corporation dedicated a 4800 square foot Adult Day Care
facility at 7320 Roosevelt Boulevard in Elkridge which
served as an interim ministry space for St. Stephens AME
Church. Plt's Comp., para. 38; Byrd Aff., para. 29.
Exhibit A

33.   The Adult Day Care Center was financed with a grant from the State of Maryland Board of Public Works in the amount of $487,000 and a $241,000 loan from the Harbor Bank and secured by a deed of trust on the Roosevelt property.  Plt's Comp., para. 39; Byrd Aff., para. 30. Exhibit A

34.   That on September 30, 2008, St. Stephens Economic Development Corporation refinanced the Roosevelt property with a $550,000 loan from the Washington Savings Bank which retired the Harbor Bank loan, which included a $50,000.00 business line of credit which was cross collateralized on the Mayfield Avenue property.  Plt's Comp., para. 40; Byrd Aff., para. 31. Exhibit A

35.   That in May 2013 the Washington Savings Bank was purchased by Old Line Bank and neither bank would remove the cross collateralized loan from the Mayfield property causing the Columbia Bank to sell its loan on the Mayfield property prior to completing the loan modification on the Mayfield property.  Plt's Comp., para. 41; Byrd Aff., para. 32. Exhibit A

36.   The Old Line Bank subsequently transferred its loan and collateral to Greenwich Investors in October 2013. Plt's Comp., para. 42; Byrd Aff., para. 31. Exhibit A

37. The St. Stephens Economic Development Corporation ceased to make monthly payments to Greenwich Investors in order to pay the mortgage on its property at 7741 Mayfield Avenue. Plt's Comp., para. 43; Byrd Aff., para. 34. Exhibit A

38. Greenwich Investors obtained a confessed judgment against St. Stephens Economic Development Corporation and St. Stephens AME Church in June 2014 and withdrew $5000.00 from the church's account at Columbia Bank as a partial payment on that bill. These funds were subsequently repaid to the church by the St. Stephens Economic Development Corporation. Plt's Comp., para. 44; Byrd Aff., para. 35. Exhibit A

39. That in order to protect the tithes and offerings of St. Stephens AME church members, the church officers voted to deposit church funds into a new account using the name of an inactive corporation affiliated with St. Stephens Economic Development Corporation, that is the St. Stephens Empowerment Center. Plt's Comp., para. 45; Byrd Aff., para. 36. Exhibit A

40. The treasurers of St. Stephens AME Church accounted for and disbursed funds from the account, providing a monthly accounting of receipts and disbursements to members of the St. Stephens AME Church official board and

church members.  Plt's Comp., para. 46; Byrd Aff., para.

37. Exhibit A

41.  Acquired Capital II, LLP commenced foreclosure

proceedings on the Mayfield property with a sale date

scheduled for March 11, 2015.  Plt's Comp., para. 47; Byrd

Aff., para. 38. Exhibit A

42.  That in the two years prior to the sale date Bruce

Martin had been recommended to Reverend Byrd by Presiding

Elder Godwin Douglas to restructure the debt.  Plt's

Comp., para. 48; Byrd Aff., para. 39. Exhibit A

43.  The St. Stephens Economic Development Corporation and

its attorney filed several injunctions with the Circuit

Court of Howard County to halt the foreclosure

proceedings.  Plt's Comp., para. 49; Byrd Aff., para. 40.

Exhibit A

44.  The official board of St. Stephens AME Church was

kept abreast of the potential foreclosure of the church

during regular held and called church meetings.  Plt's

Comp., para. 50; Byrd Aff., para. 41. Exhibit A

45.  That in December 2014 Reverend Byrd contacted

Presiding Elder Louis Charles Harvey to inform him of the

developments and to request financial assistance.  Plt's

Comp., para. 51; Byrd Aff., para. 42. Exhibit A

46.  That on March 10, 2015 with the approval of the officers of St. Stephens AME Church, St. Stephens Economic Development Corporation and members of the Washington Conference Board of Trustees filed a joint petition for bankruptcy protection in the U.S. District Court of Maryland in Baltimore.  Plt's Comp., para. 52; Byrd Aff., para. 43. Exhibit A

47.  That prior to the filing of the bankruptcy petition Reverend Byrd met with Bishop William P. DeVeaux, Sr. and the Washington Conference Board of Trustees to apprise them of the impending sale and to discuss potential solutions.  Neither the Bishop nor members of the Washington Conference Board of Trustees had any recommendations.  Plt's Comp., para. 53; Byrd Aff., para. 44; Byrd Depo. 135:3-21. Exhibits A & D

48.  Reverend Jonathan Weaver, Chairman of the Industrial Bank Board of Trustees was present at this meeting, but did not offer a bank loan as a solution.  Plt's Comp., para. 54; Byrd Aff., para. 45; Byrd Depo. 134:9-18. Exhibits A & D

49.  That subsequent to the foreclosure sale of the building, St. Stephens AME Church obtained a loan to buy back the property through the Industrial Bank with a

guarantee from the AME Church.  Plt's Comp., para. 55;
Byrd Aff., para. 45; Exhibit I

50.  That in January of 2015 a loan was negotiated by St.
Stephens Economic Development Corporation through its
financial consultant in the amount of $800,000 which was
$200,000 less than what Acquired Capital was asking to
halt the foreclosure sale.  Plt's Comp., para. 56; Byrd
Aff., para. 47. Exhibit A

51.  The Washington Conference refused to assist Reverend
Byrd with negotiating the amount of the sale price or
guaranteeing the loan which would have prevented the
Mayfield property from going into foreclosure sale.  Plt's
Comp., para. 57; Byrd Aff., para. 48. Exhibit A

52.  That between February and May of 2015 Reverend Byrd
and the Washington Conference Ministerial Efficiency
Committee met twice and met once during the Annual
Conference in April 2015.  Plt's Comp., para. 58; Byrd
Aff., para. 49. Exhibit A

53.  It was the understanding of Reverend Byrd that the
Ministerial Efficiency Committee meetings were to discuss
the situation at St. Stephens AME Church, not to  put her
on trial. Plt's Comp., para. 59; Byrd Aff., para. 50.
Exhibit A

54.   That at no time prior to the meetings with the Ministerial Efficiency Committee was Reverend Byrd given instructions as to what documents to bring to these meetings in order to establish the facts leading to the potential foreclosure sale of the building.  Plt's Comp., para. 60; Byrd Aff., para. 51; Byrd Depo. 36:14-17. Exhibits A & D

55.   The Ministerial Efficiency Committee produced a two page report regarding Reverend Byrd which was read during the 65th Session of the Washington Annual Conference, April 24, 2015, being held at Reid Temple, 11400 Glen Dale Boulevard, Glendale, Maryland 20769. Plt's Comp., para. 61; Byrd Aff., para. 53; Exhibit B

56.   A member of the Ministerial Efficiency Committee under the direction of Bishop DeVeaux did the unprecedented act of reading the entire report to over one thousand AME church members, clergy, officers and lay persons in attendance.  Plt's Comp., para. 62; Byrd Aff., para. 54. Exhibit A

57.   The report as read stated in part that Reverend Byrd did not receive permission to collateralize the church property from the Conference Trustees and failed to get approval by way of resolution from the Quarterly Conference and that Reverend Byrd was eight years

delinquent in paying the mortgage.  Plt's Comp., para. 63;
Byrd Aff., para. 55. Exhibit A

58.  The April 23, 2015 Ministerial Efficiency Committee
report stated that St. Stephens AME Church did not receive
permission to collateralize the church property from the
Conference Trustees.  Plt's Comp., para. 63; Byrd Aff.,
para. 56; Byrd Depo. 85:1-9. Exhibits A & D

59.  Reverend Byrd had permission from the St. Stephens
AME Church trustees.  Byrd Depo. 85:1-9; 86:1-21; 87:1-21;
88:1-17; 90:1-21; 91:1-20; Byrd aff., para.56.

Exhibits A & D

60.  The April 23, 2015, Ministerial Efficiency Committee
report stated that Rev. Byrd failed to get approval by way
of resolution from the quarterly conference.  Exhibit C

61.  Reverend Byrd obtained approval by way of resolution
from the quarterly conference. Byrd Depo. 35:8-21; 98:1-
18; 103:1-21; 104:1-18; Byrd aff., para.56.

 Exhibits A D & J.

62.  The April 23, 2015 Ministerial Efficiency Committee
report stated that Rev. Byrd was eight years delinquent in
paying the mortgage leading to foreclosure resulting in a
March 11th bankruptcy filing.  Exhibit B

63.   Reverend Byrd was not eight years delinquent in paying the mortgage.  Byrd Depo. 104:19-21; 105:1-6; Byrd aff., para. 56. Exhibits A & D

64.   The March 30, 2015 letter alleging comingling of church funds and report of the Ministerial Efficiency Committee were also reported to meetings of the Bishops' Council of the AME Church which includes Presiding Elders, ministers, pastors and lay persons of the AME Church worldwide.  Plt's Comp., para. 64; Byrd Aff., para. 57. Exhibit A

65.   The day care program owned and operated by the St. Stephens Development Corporation was evicted from the property at 7741 Mayfield Avenue at the instruction of Bishop DeVeaux and Presiding Elder Louis Charles Harvey harming its financial progress which would have exceeded $450,000 in 2015.  Plt's Comp., para. 65; Byrd Aff., para. 60. Exhibit A

66.   That the closing of the day care center led to a loss of fifteen jobs and a loss of income for Reverend Byrd in the sum of $54,000 plus benefits.  Plt's Comp., para. 66; Byrd Aff., para. 61. Exhibit A

67.   An audit was conducted by Phyllis Chesley, CPA, at the instruction of Bishop William P. DeVeaux, Sr. in June of 2015 and found no financial irregularities in the books

17

of St. Stephens AME Church and all church funds were
accounted for in their accounts.  Plt's Comp., para. 67;
Byrd Aff., para. 62; Byrd Depo. 71:11-15; 144:1-21; 145:1-
21. Exhibits A & D

68.   That neither Bishop DeVeaux nor the Ministerial
Efficiency Committee ever examined St. Stephens Economic
Development Corporations audits for the years 1998 to
2014.  Plt's Comp., para. 68; Byrd Aff., para. 63.
Exhibit A

69.   That in October 2015 the United States Bankruptcy
Court for the State of Maryland (Northern District)
rejected the arguments of the Second District ruling that
the fact that nine (9) years of no objection to the
project or development process on the part of the
Washington Conference was a statement of project approval
and Reverend Byrd's actions were legal.  Plt's Comp.,
para. 69; Byrd Aff., para. 64; Exhibits A & M

70.   That on February 8, 2016 in the Circuit Court for
Howard County, Maryland, the Washington Annual Conference
sought to nullify the foreclosure of the church and
daycare based on allegations of fraud, lack of authority
and lack of notice on the part of Reverend Byrd.  Plt's
Comp., para. 70; Byrd Aff., para. 65; Exhibit N

71.   That on February 8, 2016 the Circuit Court for Howard County ruled under Maryland law that Reverend Byrd and the Trustees of St. Stephens AME Church had acted legally and within their rights to develop and finance the St. Stephens Child Care and Community Center.  Plt's Comp., para. 71; Byrd Aff., para. 66; Exhibit N

72.   That neither Bishop William P. DeVeaux, Sr. nor the Washington Conference conducted an investigation which included review of documents to determine the underlying facts that led to the foreclosure sale of St. Stephens AME Church but chose to distort the facts by blaming Reverend Byrd.  Plt's Comp., para. 72; Byrd Aff., para. 67; Byrd Depo. 121:18-21; 122:1-5. Exhibits A & D

73.   That neither the Washington Conference nor Bishop William P. DeVeaux, Sr. took responsibility for not assisting St. Stephens AME Church when they were acutely aware of the financial distress.  Plt's Comp., para. 73; Byrd Aff., para. 68; Byrd Depo. 113:7-21. Exhibits A & D

74.   Presiding Elder Goodwin Douglas as part of his official duties advised St. Stephens AME Church from the project's conception until completion and the Church Conference approved the project.  Plt's Comp., para. 74; Byrd Aff., para. 69. Exhibit A

75.  The project from conception to constructions lasted from 1994 to 2006 and all the officials affiliated with the project had notice and participated in their completion.  Plt's Comp., para. 75; Byrd Aff., para. 70. Exhibit A

76.  During discovery it was revealed that the Ministerial Efficiency Committee report dated March 17, 2016, stated that Reverend Byrd did not receive permission to collateralize the church property from the Conference Trustees and failed to get approval by way of resolution from the Conference Trustees and that Reverend Byrd was eight years delinquent in paying the mortgage. Amended Comp., para.77; Byrd Aff., para. 58; Byrd Depo. 86:1-21. Exhibits  A  D & C

77.  That Bishop DeVeaux's publication of the Ministerial Efficiency Committee report and March 30, 2015 letter alleging comingling of church funds to the members of the clergy exposed Dr. Byrd to public scorn, ridicule, humiliation, embarrassment and potential legal action. Plt's Comp., para. 76; Byrd Aff., para. 71. Exhibit A

78.  Reverend Byrd has suffered greatly and her reputation and good name has been tarnished.  Plt's Comp., para. 76; Byrd Aff., para. 72; Byrd Depo. 66:9-21; 67:1-10. Exhibits A & D

79.   Reverend Byrd's ability to pastor and to enjoy the company of many friends she had developed over thirty (30) years of ministry in the AME Church is now tarnished. Byrd Aff., para. 72; Byrd Depo. 66:9-21; 67:1-10. Exhibits A & D

80.   Reverend Byrd has been discredited within the clergy profession, suffered loss of income and loss of reputation within the larger community.  Plt's Comp., para. 76; Byrd Aff., para. 71. Exhibit A

Respectfully submitted,

COLEMAN & HEARNS, LLC

/s/Bernard C. Coleman, Jr.
Bernard C. Coleman, Jr.(10502)
1401 Mercantile Lane
Suite 104
Upper Marlboro, Maryland 20774
(301) 567 1920
bernardccolemanjr@gmail.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

_____

Reverend Alicia Byrd, Ph.D.

                                  :

       Plaintiff,           :

      vs.                     :

                                   Case No. DKC 17-3251

Bishop William P. DeVeaux, et al. :

                                  :

       Defendants.

_____

**PLAINTIFF'S MEMORANDUM OF POINTS OF AUTHORITY IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

**DISCUSSION**

**A.  LEGAL STANDARD**

The Court must grant summary judgment where the
"pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material
fact."  Fed. R.Civ. P. 56(c).  While the moving party
bears the burden of demonstrating a lack of genuine issues
of material fact, *Rule 56* further requires that the non-
moving party "go beyond the pleadings by [entering
evidence] showing there is a genuine issue for trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324, 106 S.Ct. 2458, 91 L.Ed.2d 265 (1986). "The presence of disputed facts by itself is insufficient to defeat summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue of material fact qualifies as genuine only if there is evidence on which a jury could base a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. 2505.

"If the moving party is successful, that party is entitled to summary judgment as a matter of law, if the opposing party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. " *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "In making this determination, the Court must view all inferences 'in the light most favorable to the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"A motion for summary judgment is appropriate if the court determines that no genuine issue of material fact is in dispute. Fed.R.Civ.P.56 (c),(e). Disputes of fact must relate to material facts; that is, facts that are directly germane to legal issue involved. *JKC Holding Co.*

*v. Wash-Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir.2001).* Differences as to immaterial facts will be disregarded for purposes of ruling on the motion. *Id.*"

## II. ANALYSIS

### A. To Establish A False Light Invasion of Privacy Claim

"To establish a false light invasion of privacy claim in the State of Maryland, a plaintiff must prove the following elements: (1) that the defendant gave publicity to a matter concerning another that places the other before the public in a false light; (2) that the false light in which the other person was placed would be highly offensive to a reasonable person; and (3) that the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Chinwuba v. Larsen*, 142 Md. App. 327, 359, 790 A.2d 83, 101 (2002); Restatement (Second of Torts), Section 652E.

The defendant gave publicity to a matter concerning Dr. Byrd that placed her before the public in a false light. The instant case began with an inquiry regarding the efficiency of an elder(pastor) in the AME Church pursuant to *The Discipline.* Dr. Byrd appeared before the

Ministerial Efficiency Committee (hereinafter "MEC") as directed by the defendant, Bishop DeVeaux.

Dr. Byrd appeared before the MEC on March 19 and March 26, 2015.  The MEC met for a total of two hours and allegedly wrote a report that was published on April 23, 2015.

The MEC writes in paragraph three of their report "[i]t was further determined that Rev. Byrd failed to secure approval from the Conference trustees and failed to secure a resolution duly approved by the Quarterly conference to collateralize St. Stephens property per AMEC Discipline 2012 page 53 section B paragraph 1. Exhibit B.

B. Local Church Property – Transfer of Property

**The Board of Trustees, duly elected by the local church as provided by *The Doctrine and Discipline of the African Methodist Episcopal Church*, may take such steps to purchase, mortgage, sell, transfer and convey real and personal property, PROVIDED that such transfer has been duly approved by the resolution in Quarterly Conference of the said church, and also by the trustees of the Annual Conference in which the property is located, and in which the presiding bishop is present.**

The use of Section B of The Discipline was not in error.  These scholars who are men and women of the gospel are well versed in *The Discipline*.  Section B was not applicable to the facts.  The MEC members' action raises a serious question as to why they would act in this manner.

First of all the MEC members did not write the report.
The report was written by the attorney that represents the
2nd Episcopal District.  Moreover, the bishop referred Dr.
Byrd to the MEC and the bishop will always have the first
and last word due to the fear of the bishop and how much
disruption can occur in their lives if they cross the
bishop.

Section C. Mortgaging Property page 54 states:

> **The Board of Trustees and Incorporators of**
> **The local church, elected, and organized**
> **As prescribed in The Doctrine and Discipline**
> **Of the African Methodist Episcopal Church,**
> **Shall have the power to mortgage or encumber**
> **The property of the local church or corporation,**
> **PROVIDED such action has been authorized my**
> **Majority vote of the membership present in a**
> **Duly called Church Conference for this specific**
> **Purpose. . . .**

Two, the false light in which the other person was
placed would be highly offensive to a reasonable person.
An active member of the clergy most prized possession is
his or her reputation.  It is embarrassing enough to be
referred to the MEC but to have a report read to over 1000
people that infers theft, malfeasance, not trustworthy and
character flaws is a death sentence for a member of the
clergy.  These characterizations would be highly offensive
to a reasonable person.

Lastly, that the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. A troubling aspect of the report is the statement that "Rev. Byrd was eight years delinquent in paying the mortgage leading to foreclosure resulting in a March 11th bankruptcy filing.

This statement is appalling. It is unreasonable and it stretches credulity for the MEC to conclude and believe that a mortgage lender would allow a mortgagee to violate the terms of a deed of trust for 96 months and not pursue legal action to satisfy such a claim. Interestingly enough, not one member of the MEC challenged the bishop on this falsehood. The MEC members allowed this falsehood to be used against Dr. Byrd.

To add insult to injury it was learned during discovery that the MEC published another report dated March 17, 2016 during the 66th Session of the Washington Annual Conference. This report stated "[i]t has been determined that Rev. Alicia Byrd collateralized the church property of St. Stephens AME Church to build a non-profit facility. This was done without the approval of the local church Trustees, the local Church Conference and the Washington Annual Conference Trustees. This has resulted

in foreclosure proceedings on the church property of St. Stephens AME Church.

This edition of the false publication essentially states that the foreclosure occurred because Rev. Byrd failed to obtain the necessary approvals.  A preposterous and outrageous statement to further injure Dr. Byrd.

**B.   A Tainted Disciplinary Proceeding**

In the instant case, the complaint contains the necessary elements of false light invasion of privacy. The Committee on Ministerial Efficiency published an April 23, 2015 report which falsely stated that 1) St. Stephens AME Church did not receive permission to collateralize the church property from the Conference Trustees, 2) Reverend Byrd failed to get approval by way of resolution from the quarterly conference and 3) Reverend Byrd was eight years delinquent in paying the mortgage leading to foreclosure resulting in a March 11th bankruptcy.

The entire report from the Ministerial Efficiency Committee was read on the floor of the 65th Session of the Washington Annual Conference.  In attendance were over 1000 members of the clergy, delegates, visitors and guests. The statements were false and it characterized Reverend Byrd as being dishonest.

28

Reverend Byrd became the pastor of St. Stephens AME Church in 1988.  The church was built in 1900 and lacks many amenities.  Reverend Byrd with the assistance of the community and other organizations established a non-profit entity called the St. Stephens Economic Development Center to be the entity that could accomplish the goals established by the members of St. Stephens AME Church. The church established an Expansion Committee that consisted of church members to seek means to expand the church. The Expansion Committee accomplished its task and was able to vote on the matter before the entire congregation and a vote was taken.

Next, the St. Stephens Economic Development Corporation associated with St. Stephens AME Church to build a daycare center that was available for church meetings, office space, community meetings and a fully operational daycare center serving the clientele in Howard County, Maryland.

Resolutions were passed. Attached as Exhibit *.  For the defendants to allege that Reverend Byrd did not obtain permission from the church conference is a false statement.

The injury that Reverend Byrd suffered she continues to suffer today.

The Bishop also published a letter to the Council of Bishop outlining the same false statement.  This fact was confirmed by Reverends Bell and Browning. Byrd Depo. 78:15-21; 79:1-21; 80:1-21; 81:1-21; 82:1-21.

**B.  The Court Has Subject Matter Jurisdiction**

"The First Amendment's Establishment Clause and Free Exercise Clause grant churches immunity from civil discovery and trial under certain circumstances in order to avoid subjecting religious institutions to defending their religious beliefs and practices in a court of law." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 1320, 59 L.Ed.2d 533 (1979).

Commencing in 1871 with *Watson v. Jones*, 13 Wall, 679, 80 U.S. 679, 20 L.Ed. 66 (1871), and continuing through 1979 with *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), the Supreme Court has made clear that, under the First Amendment Establishment and Free Exercise clauses, civil courts have no authority to second-guess ecclesiastical decisions made by a hierarchical church bodies.  The most succinct expression of this doctrine appears in *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724-25, 96 S.Ct. 2372, 2387-88, 49 L.Ed.2d 151 (1976):

> **"In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters.  When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decision as binding upon them."**

In a law review article by Professor of Law Ira Mark Ellman, *Driver from the Tribunal: Judicial Resolution of Internal Church*, 69 Calif. L. Rev. 1378 (1981), writes "[a]ny organization may experience internal dissension. For business corporations, social clubs, charities, or trade associations, such aid is normally available.  But "if the organization is a church, concern over the propriety of state intervention may cause a court to refrain from deciding the dispute." *Id* at 1380.

"Most internal church disputes can be constitutionally adjudicated without resorting to special doctrines of judicial deference or abstention*." Id* at 1385.

In *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16-17, 50 S.Ct. 5, 74 L.Ed. 131 (1929), Justice Brandeis reliance on the contract principle was quite explicit:

> **In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive because the parties in interest made them by contract or otherwise.  Under like circumstances, effect is given in the courts to the determinations of the judicatory bodies established by clubs and civil associations.**

"There are two distinct forms of church organization, congregational and hierarchical.  A congregational is a church where each local body is self-governing and independent.  Hierarchical churches are organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head." *77 CJS Religious Societies, Section 5.*

"The A.M.E. is a hierarchical, connectional denomination, in which each individual affiliate church belongs and makes financial payments to the A.M.E. "Connection" through area "Annual Conferences."  The A.M.E. publishes its internal governing policies in a handbook entitled *The Doctrine and Discipline of the African Methodist Episcopal Church* (hereinafter, the "Book of Discipline" or the "Discipline"), which is updated every four years."  *Mt. Olive African Methodist Episcopal*

*Church of Fruitland, Inc. v. Board of Incorporators of the African Methodist Episcopal Church, Inc.,* 348 Md. 299, 303, 703 A.2d 194 (1997).

"The record is clear that there is only one 'discipline' --- that of the A.M.E. Church.  The term 'discipline' means the A.M.E. Church's governing constitution.  *Id* at 307.

In the instant case, the 2012 edition of the Discipline is being referenced as the governing constitution and bylaws of the A.M.E. Church.  *The Discipline* is published every four years by the General Conference, edited and approved by the Compilation Committee.  The 2012 edition was published by order of the Forty-ninth Conference, held in Nashville, Tennessee, June 27 – July 4, 2012. Published by the AMEC Publishing House.

"A religious society may adopt rules or bylaws for the government of its affairs which will be binding unless they are unreasonable or in conflict with law." *CJS Religious Societies, Section 6.*

"The bylaws of a church corporation form a contract between the church and its members, and are interpreted according to the principle of contract law."  *The General Convention of the New Jerusalem in the United States of*

33

*America, Inc. v. MacKenzie*, 449 Mass. 832, 835, 874 N.E.2d 1084 (2007).

The Ministerial Efficiency Committee in its April 23, 2015 publication regarding Reverend Byrd, paragraph three states "[i]t was further determined that Rev. Byrd failed to secure approval from the Conference trustees and failed to secure a resolution duly approved by the Quarterly conference to collateralize St. Stephens property per AMEC Discipline 2012 page 53 section B paragraph 1. Exhibit B

Section II. General Church Property discusses Section A. Purchase Transfer. Section B. Local Church Property-Transfer of Property. Section C. Mortgaging Property and Section D. Abandoned Property. Exhibit E

Section B states "[t]he Board of Trustees, duly elected by the local church as provided by The Doctrine and Discipline of the African Methodist Episcopal Church, may take such steps to purchase, mortgage, sell, transfer and convey real and personal property, PROVIDED that such transfer has been duly approved by the resolution in Quarterly Conference in which the property is located, and of which the presiding bishop is president." Exhibit E

Section C states "[t]he Board of Trustees and Incorporators of the local church, elected and organized as prescribed in The Doctrine and Discipline of the

34

African Methodist Episcopal Church, shall have the power to mortgage or encumber the property of the local church or corporation, PROVIDED such action has been authorized by majority vote of the membership present in a duly called Church Conference for this specific purpose." Exhibit E

The applicable section to the facts of the instant case is Section B. The real property was encumbered and the St. Stephens Trustees approved the encumbrance.

Moreover, Section C is consistent with the Court of Appeals of Maryland decision in *Mt. Olive African Methodist Episcopal Church of Fruitland v. Board of Incorporators of the African Methodist Episcopal Church, Inc.*, 348 Md. 299, 313-314 (1997)when discussing church property stated, "[i]t is clear that when a congregation is incorporated under the General Religious Law applicable to all religious groups, the trustees and local congregation own and control the property of the local church. . . ."  So far as the Maryland statutory law is concerned, there seems to be little doubt that the trustees and congregations of the local churches are entitled to own, use and control the property of the respective corporation.  Dr. Byrd used the correct provisions of *The Discipline. Exhibits F G J & K*

35

Bishop DeVeaux and his minions deliberatively applied Section B to injure the plaintiff's reputation. None of the members of the MEC opposed Bishop DeVeaux for the simple reason that Bishop DeVeaux as bishop exclusively makes the annual assignment to what church an AME pastor will be assigned. Incidentally, the MEC is made up of the most successfully financial viable AME Church in the Second Episcopal District. These pastors are appointed and asked to pass upon the efficiency of pastors without in-house training on how to properly conduct investigations. The members of the MEC did not interview any members of the St. Stephens Economic Development Corporation. The MEC members did not interview bank officials and did not review bank statements. The MEC did not review minutes from the trustees of St. Stephens AME Church. The MEC receive no formal or informal training on the proper methodology for conducting a deliberative hearing. The MEC do not receive orientation on how to conduct an investigation.

Dr. Byrd testified "[i]f a bishop wants to do harm to a minister that person can be referred to the Ministerial Efficiency Committee as a cover for action. You won't find that in the Discipline. Byrd Depo. 32:2-5. Exhibit D

The chairman of the Ministerial Efficiency Committee, Reverend Michael E. Bell, testifying in a deposition dated Wednesday, July 11, 2018 stated:

Q:  I get the impression from talking to other pastors that a referral to the MEC is frightening or scary.

A.  It is.

Q:  Why is it frightening or scary?

A.  Because people view the MEC as a punitive measure and nobody really wants to serve on the MEC. Bell Deposition, 11:19-21; 12:1-3. Exhibit L

"Internal church disciplinary proceedings which are tainted by fraud or collusion when the church governing body acts in bad faith for secular purposes may be subject to civil court inquiry in a proper proceeding.  The higher "burden of proof" typically applied to cases of fraud applies equally in this context.  The scope of review is constitutionally limited so that the civil courts do not adjudicate ecclesiastical matters." *First Baptist Church of Glen Este v. State of Ohio*, 591 F.Supp. 676 683 (1983).

"When a congregational or hierarchical organization is involved, the decision of the highest church judicatory to which question has been taken, as to questions of church discipline or government, are, so far as they are

relevant, final and binding on civil courts; civil courts
can grant relief from such decisions only if, by the
narrowest kind of review, they are found to have resulted
from fraud, collusion or arbitrariness." *Presbytery of
the Covenant v. First Presbyterian Church of Paris, Inc.,*
552 S.W.2d 865, 870-71 (1977*); Gonzalez v. Roman Catholic
Archbishop*, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131;
*Presbyterian Church in the United States v. Mary Elizabeth
Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 447
(1969).

The proceedings as highlighted by *The Discipline*
states that the Committee on Ministerial Efficiency that
the bishop shall appoint a Committee on Ministerial
Efficiency consisting of five elders (pastors).  The
Ministerial Efficiency Committee meetings that Reverend
Byrd attended consisted of ten elders (pastors).  Namely,
Reverends Michael Bell, Chairman, Grainger Browning,
Barbara Glenn, C. Michelle Langston, William Lamar, IV,
Anna Mosby, Harry Seawright, Lee P. Washington, Jonathan
Weaver, and Henry White. Exhibit E

The MEC met with Reverend Byrd on March 19, 2015 and
March 26, 2015.  They met for a total of two hours. The
meetings were not recorded. Reverend Byrd was not told
what to bring to the meetings. Reverend Byrd brought to

the initial meeting documents which she thought would be helpful in their deliberations but was told by presiding elder Ronald Braxton "that is not why we are here. Byrd Deposition, 36: 1-17. Exhibit D

The MEC was directed to use the incorrect section dealing with real property in an effort to satisfy the dictates of Bishop DeVeaux.

Reverend Byrd was not required pursuant to The Discipline to obtain permission from the Conference Board of Trustees, nor get approval by way of resolution of the Quarterly Conference.  Even though not required by the Discipline Revered Byrd had quarterly meetings with her presiding elder, Goodwin Douglas.  Goodwin Douglas was instrumental in assisting Reverend Byrd and St. Stephens AME church build two buildings on their property.

The Presiding Elder is the administrator and advisor to the pastors in his district.  The responsibilities that the MEC attempted to cast upon Reverend Byrd are the duties of the Presiding Elder.  The Presiding Elder is the vice chair of the Conference Board of Trustees.

In addition, is does not state anywhere in *The Discipline* that a pastor has to appear before the Conference Board of Trustees.

The Discipline states on page 211-212 that the Annual Conference Trustees are required to meet at least twice during the conference year ... Minutes and actions of the Annual Conference Trustees shall be recorded and copies provided to the bishop and each member of the Board of Trustees and annual conference.  Exhibit E

Reverend Byrd, as a pastor, is a member of the Annual Conference and she is competent to testify that in her twenty-seven years of serving as pastor within the Washington Conference she has never received copies of the minutes and actions of the Annual Conference Trustees.

The Defendants have acted in total disregard for the bylaws contained in *The Discipline*.  They essentially have not played by the rules.  The recommendations by the MEC were rendered in violation of its own stated bylaws found in *The Discipline.*

## C.  Common Law Privileges Not Applicable

"Common interest privilege, the policy underlying the common law was that a person should not be held liable for defamation when that person is good faith . . . publishes a statement in furtherance of his legitimate interests, or those shared in a common with the recipient or third parties."  *Marchesi v. Franchino*, 283 Md. 131, 135-36.

The defendants write that "common interests are usually found among members of identifiable groups in which members share similar goals or values or cooperate in a single endeavor ...  The idea is to promote free exchange of relevant information among those engaged in a common enterprise or activity and to **permit them to make appropriate internal communications and share communications and share communication without fear of suit ...(emphasis mine).**

The two publications by the MEC at the behest of Bishop DeVeaux were not made in good faith.  They were published with the intent of injuring Dr. Byrd.

The privilege is forfeited if the publication was made with malice. "If the publication is made with malice, that is, knowledge of falsity or reckless disregard for truth." *Lindenmuth v. McCreer*, 233 Md. App 343, 359 (2017).

Bishop DeVeaux's authority as granted by The Discipline states "the bishop shall decide all questions of law in the Annual Conference."  Exhibit E

The bishop has the first and last word in any matter in the Washington Conference.  With this power, who is to say that the bishop has not abandoned his ill-will toward

Dr. Byrd for her not supporting Bishop DeVeaux when he ran for the position of bishop.

Moreover, Bishop DeVeaux is required to know *The Discipline.* He referred Dr. Byrd to the MEC. He told the chairman of the MEC why she being referred but no one told Dr. Byrd when she was being referred to the MEC. Bishop DeVeaux allegedly directed the attorney for the Second Episcopal District to write the first publication of the false statements against Dr. Byrd. What has been clear in this case is that the language used in the initial publication is language that a lawyer would use.

"Qualified immunity has been granted generally to comments or criticisms of matters of public figures or concerning the official conduct of public officials, provided the statements are made without actual malice." *A.S. Abell Co. v. Barnes*, 258 Md. 56, 58-59, 265 A.2d 207 (1970).

This is not a property dispute. Dr. Byrd proceeded according to *The Discipline*. The financial issues that confronted St. Stephens Economic Development Corporation and St. Stephens AME Church was the result of the financial crisis that this country faced in 2008-2009. Let us not lose sight of the truth of what triggered the situation.

42

Regarding the scope of "malice," the court made it *Marchesi v. Franchino,* 283 Md. 131, 139, 387 A.2d 1129 "that knowledge of falsity or reckless disregard for truth is the standard by which malice required to defeat the conditional privilege is to be measured in cases of private defamation."

The court concludes "our cases make clear that resolution of whether the privilege has been abused and whether malice exists is ordinarily a jury question." *McDermott v. Hughley*, 317 Md. 12, 30 (1989), citing General Motors Corp. v. Piskor, 277 Md. 165, 352 A.2d 810 (1976).

**D.   No Claim by Plaintiff Regarding Removal**

The defendants states that Dr. Byrd disagrees with the church's decision to remove her as pastor.  Dr. Byrd was not assigned to a church and she was not removed. Moreover, Dr. Byrd has not made a claim in her complaint regarding her not being assigned to a church.  Our position is that Dr. Byrd was not assigned to a church. To be perfectly clear, the MEC recommended that in its supplemental report dated March 17, 2016 that Reverend Alicia Byrd not be assigned a pastoral charge in the Second Episcopal District.  Exhibit C

**E.   Vicarious Liability and Punitive Damages**

"Under the well-established rule of *respondeat superior*, an employer ordinarily is liable for the torts committed by its employees while acting within the scope of employment."  In the instant case the defendants have admitted that Bishop DeVeaux is employed by the Washington Conference and the AME, Inc. When the incident complained of in this case, Bishop William P. DeVeaux was serving as bishop in the Washington Conference.

"**The simple test is whether they were acting within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by a servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By "authorized"  is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive order.**"

*Fidelity First Home Mortgage Company v. Williams*, 208 Md.App. 180, 202, 56 A.3d 501 (2012)(quoting from Wood on Master and Servant, Section 279 (1877).

Bishop DeVeaux's principle guide for his responsibilities are found in *The Discipline* in the section regarding the authority of active bishops.  The Discipline states that the bishop shall decide all questions of law in the Annual Conference and the bishop shall not have anything in this section applied which will prevent the bishop from using godly judgment in making

changes in the appointments that are deemed necessary for the good of the church. Exhibit E

Moreover, in *Embrey v. Holly*, 293 Md. 128, 442 A.2d 966 (1982), the Court of Appeals held that an employer may be liable for punitive damages arising from the tortious conduct of its employee.  Maryland follows the majority rule: that punitive damages can be vicariously imposed "on the master for acts of the servant committed during the course of his employment without regard to whether the master authorized, participated in, or ratified the employee's conduct." *Id*, quoting *Boyer & Co. v. Coxen*, 92 Md. 366, 368, 48 A. 161 (1901).

Tee court concludes with:

> **"Any liability of the master for a tort
> of his servant is dependent upon the fact
> that the servant was acting at the time
> in the course of the master's service, and
> for his benefit, within the scope of his
> employment.  The master selects him for
> that service and knows, or ought to know,
> what sort of person he is investing with
> authority to act for him.  The servant is
> acting for his master when the wrong is
> done - it is in contemplation of the law
> of the master."**

**F.  The Law of the Case**

We thought that it would be appropriate to inform this Court that the decision of Dr. Byrd regarding the

applicable section of real property in The Discipline has been addressed in two separate courts.

The first was in the United States Bankruptcy Court for the District of Maryland (Northern Division). A hearing was held on October 8, 2015 before the Honorable James F. Schneider.  There were several motions before the Court but we will submit the portion of the transcript germane to the matter that is currently before this Court. On page 98:16-22 the Court states "[t]he problem is, is that what governs here is not only the law of the bankruptcy code but the State law that applies to the ability of parties to enter into these kinds of financial arrangements.  The State law gives the Board of Trustees of St. Stephens AME Church the authority to enter into the encumbrance of property in return for a loan, the sale of buildings and other things."  Transcript Exhibit M

The second was in the Circuit Court for Howard County, Maryland before the Honorable Timothy J.McCrone on February 8, 2016.  On page 24: 1-12 states "[i]n addition, the certificate as to resolutions and incumbency indicate that the Articles of Incorporation were attached and they indicate that Page 3, all property now or hereafter be held by the trustees for the use of said church shall be vested in said body, corporate, and its successors with

the right to the said trustees or to use or lease mortgage or sale and convey the same in such manner as they may judge most conducive to the interest of the church.

On page 25:3-12 the Court states "[a]nd lastly, it would seem to me that the interested third parties have ratified the transaction by failing to object for over nine years. That the deed was executed in 2005 and the daycare center was completed well-before these proceedings. The church has regularly used the building constructed with the borrowed funds for Sunday School and Bible workshop. Things of that Sort. Transcript Exhibit N

We ask how much punishment must Dr. Byrd endure because of her decision to abide by the rules clearly articulated in *The Discipline* of the AME Church.

### Conclusion

For the foregoing reasons, the Court should deny the Defendants' Motion for Summary Judgment.

Respectfully submitted,

COLEMAN & HEARNS, LLC

/s/Bernard C. Coleman, Jr.
Bernard C. Coleman, Jr.(10502)
1401 Mercantile Lane
Suite 104
Upper Marlboro, Maryland 20774
(301) 567 1920

47

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 20th day of August, 2018, a copy of the foregoing Motion in Opposition to Defendants' Motion for Summary Judgment and proposed Order were forwarded electronically to Andrew J. Chiang of O'Hagan Meyer, PLLC, 2560 Huntington Avenue, Suite 204, Alexandria, Virginia 22303 and Catherine M. Manofsky of Kramon & Graham, P.A., One South Street, Suite 2600, Baltimore, Maryland 21202-3201.

/s/Bernard C. Coleman, Jr.
Bernard C. Coleman, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

_____

Reverend Alicia Byrd, Ph.D.

                                   :

       Plaintiff,            :

       vs.                   :

                                        Case No. DKC 17-3251

Bishop William P. DeVeaux, et al.  :

                                   :

       Defendants.

_____

**O R D E R**

UPON CONSIDERATION of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, its Memorandum of Points and Authorities in Opposition to Motion for Summary Judgment and the entire record herein, on this _____ day of _____, 2018, it is hereby

ORDERED that Defendants' Motion for Summary Judgment be and is DENIED.

_____
The Honorable Judge Deborah K. Chasanow